UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI *ex rel.* CATHERINE L. HANAWAY, ATTORNEY GENERAL OF MISSOURI, CHARLES CACIOPPO JR., and INDUSTRIAL SALVAGE AND WRECKING CO. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. |
| CITY OF KANSAS CITY, MISSOURI; JAIME GUILLEN, in his official capacity as the Director of the Department of Civil Rights and Equal Opportunity; and MARIO VASQUEZ, in his official capacity as the City Manager of the City of Kansas City, Missouri, | ) | |
| Defendants. | ) | |

## COMPLAINT

For its Complaint, Plaintiffs the State of Missouri, appearing on the relation of its Attorney General; Charles Cacioppo Jr.; and Industrial Salvage and Wrecking Co. respectfully allege as follows:

## INTRODUCTION

1. The U.S. Constitution establishes a clear rule: "equality of treatment before the law for all persons without regard to race or color." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 205 (2023) (quoting *Browder v. Gayle*, 142 F. Supp. 707, 715 (M.D. Ala. 1956)). Thus, the Supreme Court has "time and again forcefully rejected the notion that government

actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id.* at 220 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)).

2. Federal law also generally prohibits treating men and women differently—unless the government policy is carefully tailored to support an important state interest. *See United States v. Virginia*, 518 U.S. 515, 532–33 (1996).

3. The City of Kansas City, Missouri, unfortunately disagrees with these rules and blatantly discriminates on the basis of race and sex.

4. For three decades, Kansas City has distributed government contracts on the basis of race and sex in the name of "affirmative action."

5. This is not a secret. The City openly admits it discriminates on the basis of race and sex. *See, e.g.*, Code § 3-427; Code § 3-421(a)(34), (47).[1]

6. Therefore, to justify its racially discriminatory policy, Kansas City bears the burden of proving that its policy satisfies strict scrutiny—*i.e.*, that its policy is narrowly tailored in furtherance of a compelling governmental interest. *See, e.g.*, *SFFA*, 600 U.S. at 206–07; *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

7. As relevant here, the Supreme Court has recognized only one situation in which a government can justify using a racial preference under strict scrutiny. Governments may employ a racial preference in favor of a particular group to remedy

[1] All citations to "Code" refer to Kansas City, Missouri's Code of Ordinances.

"specific, identified instances of past discrimination" by the government "that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207. However, even that kind of classification must be "temporary." *Id.* at 212.

8. To justify favorable treatment of one sex over another, Kansas City "must show 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."'" *United States v. Virginia*, 518 U.S. at 533 (alteration in original) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

9. Kansas City cannot meet either of its burdens. In fact, Kansas City recently commissioned a disparity study to determine whether its race- and sex-based contracting program should continue as structured. That study concluded that such policies are no longer justified. *See generally* 2026 Disparity Study.[2]

10. Nevertheless, Kansas City continues to discriminate. And City Council members resisted the findings and recommendations of their own commissioned study.[3]

11. Similarly, the Mayor of Kansas City thinks the "courts suck" today and disagrees with the standards the Supreme Court has clearly delineated. *See* May

---

[2] https://www.kcmo.gov/home/showpublisheddocument/16672/639143574123270000

[3] *See, e.g.*, Patrick Tuohey, *Great news on KC minority and women contractors. Why so glum, City Council?*, Kansas City Star, June 18, 2026, https://www.kansascity.com/opinion/article316163188.html ("One might expect the report to be cheered as a sign of success—that Kansas City has turned the corner on ensuring proportional representation in contracting. But that was not the case.").

2026 Disparity Study Presentation at 1:38:43–52.[4] But his disagreement with the Court does not authorize Kansas City to continue perpetuating race- and sex-based discrimination.

12. Kansas City's race- and sex-based contracting program violates the Fourteenth Amendment and 42 U.S.C. § 1981.

13. Thus, Plaintiffs are entitled to declaratory and injunctive relief and nominal damages against Kansas City's continued enforcement of its discriminatory program for public contracting.

## PARTIES

### I. Plaintiffs

14. Plaintiff State of Missouri is a sovereign State of the United States of America.

15. Catherine L. Hanaway is the 45th Attorney General of the State of Missouri.

16. Attorney General Hanaway is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary." Mo. Rev. Stat. § 27.060.

17. The State of Missouri, on relation of its Attorney General, brings this action to put an end to Kansas City's systemic race- and sex-based discrimination.

---

[4] https://www.kcmo.gov/city-hall/departments/disparity-study-2026-2379

18. Missouri comes to this Court asking for an order it should never have had to request: an order compelling Kansas City to end its discriminatory contracting practices.

19. Missouri, through its Attorney General, has the authority to bring this action because this suit alleges that Kansas City has, is, and will continue engaging in systemic race and sex discrimination against Missourians, which is conduct in which the State has an express interest under Missouri Revised Statute § 27.060.

20. Likewise, Missouri has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.

21. "[A] State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982).

22. States have a similar stake in securing residents from the harmful effects of discrimination—particularly with actors wielding regulatory authority.

23. Deliberate efforts to stigmatize businesses as ineligible for public-contract dollars because of their owners' race or sex carry a universal sting.

24. States can seek, in the federal courts, to protect their residents from such discrimination to the extent that it violates federal law. *See* 13B Wright & Miller, Federal Practice & Procedure Jurisdiction § 3531.11.1 (3d ed. 2025).

25. Missouri sues to vindicate its quasi-sovereign interest in securing its residents from the harmful effects of race and sex discrimination that Kansas City has caused, is causing, and, if not stopped, will keep causing.

26. The Fourteenth Amendment and 42 U.S.C. § 1981 create benefits and alleviate hardships for all because they seek to deter discrimination by state actors on the bases of race and sex and provide relief from it when it unlawfully happens.

27. Missouri, of course, recognizes the odiousness of its actors engaging in discriminatory activity while acting in its name and exercising Missouri's regulatory authority. This creates an interest for Missouri to eliminate any and all violations of the Fourteenth Amendment and Section 1981.

28. Therefore, Missouri has an interest, independent of the impacts that might accrue to any particular individual, in assuring that the benefits of federal law are not denied to its general population.

29. Thus, Missouri sues to vindicate its quasi-sovereign interest in ensuring its residents are not excluded from the benefits that are to flow from, and hardships that are to be alleviated by, Section 1981.

30. Plaintiff Charles Cacioppo Jr. is a citizen of Missouri and the United States.

31. Cacioppo is a Caucasian, non-Hispanic male.

32. Cacioppo owns and is the President of Plaintiff Industrial Salvage and Wrecking Co.

33. Industrial Wrecking is a Missouri corporation with its principal place of business in Kansas City, Missouri. Industrial Wrecking is also registered and licensed in the State of Kansas. Industrial Wrecking does not qualify as a minority or woman business enterprise in Kansas City, Missouri, because it is not majority owned, managed, and controlled by a minority or by a woman.

34. Industrial Wrecking has won multiple demolition contracts that Kansas City has offered. It remains qualified, willing, and able to bid on and perform Kansas City contracts in the future.

35. Cacioppo and Industrial Wrecking want to bid for contracts in a system where Kansas City does not consider race or sex.

36. Cacioppo and Industrial Wrecking have distinct interests from the State of Missouri in being free from unlawful discrimination under the Fourteenth Amendment and Section 1981.

37. As a state actor, Kansas City's refusal to utilize public-contract dollars free of discrimination on the basis of Cacioppo's race and sex constituted and continues to constitute a deprivation of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

38. Likewise, Kansas City denied and continues to deny Cacioppo and Industrial Wrecking "the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a).

39. Cacioppo and Industrial Wrecking therefore sue to vindicate their individual interests against unjust discrimination.

## II. Defendants[5]

40. Defendant City of Kansas City, Missouri, is a constitutional charter city of the State of Missouri and includes its City Council, City Manager, and all councils,

[5] Hereinafter, Defendants are referred to collectively as "Kansas City."

agents, servants, employees, commissions, committees, and persons or entities acting for or on behalf of Kansas City and its City Council. Kansas City has the authority to enforce Kansas City's minority and women business enterprise program ("MWBE program"). Mo. Rev. Stat. §§ 82.010, 82.300.1; K.C. Charter § 102; *see generally* Code §§ 3-421 *et seq*. Kansas City's MWBE Program is codified in its Code of Ordinances as Chapter 3, Article IV, Division 2, §§ 3-421–3-500, which is hereinafter referred to as the "MWBE ordinance."

41. Specifically, Kansas City enforces the MWBE ordinance through the Civil Rights and Equal Opportunity Department ("CREO"), the city departments, and incentive agencies. *See generally* Code §§ 3-421 *et seq*.

42. Defendant Jaime Guillen is the Director of CREO and has the authority to enforce the MWBE ordinance. *See, e.g.*, Code § 3-421(a)(20).

43. Defendant Mario Vasquez is the City Manager of Kansas City. As the City Manager, he "appoints most department directors," including the Director of CREO; "enforces municipal laws and ordinances," including the MWBE ordinance; and "coordinates City operations and programs." *See, e.g.*, Kansas City, *City Manager's Office*[6]; Code § 3-421(17)–(18), (20); Code § 3-461(t).

[6] https://www.kcmo.gov/city-hall/departments/city-manager-s-office

## JURISDICTION AND VENUE

44. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343 because this case involves federal claims under a provision of the U.S. Constitution and 42 U.S.C. § 1981.

45. This Court has the authority to issue the requested declaratory relief under 28 U.S.C. §§ 2201–2202 and this Court's inherent equitable authority.

46. Venue is proper in this judicial district and division under 28 U.S.C. § 1391(b)(1) and Local Rule 3.2(b)(2) because Defendants are residents of Missouri who are deemed to reside in the Western District and Western Division, and a substantial part of the events or omissions giving rise to the claims occurred and continue to occur in this district and division.

47. Kansas City, Missouri, is located in the Western District and could reasonably anticipate being subject to suit in this District.

## FACTS COMMON TO ALL COUNTS

### I. Industrial Wrecking

48. Founded in 1961, Industrial Wrecking is a family-owned demolition company.

49. Industrial Wrecking's commitment to clients is as unwavering as its vision statement: "We wreck anything and we love what we do."

50. Industrial Wrecking is owned by Plaintiff Charles Cacioppo Jr., who is a non-Hispanic Caucasian man.

51. Industrial Wrecking has won multiple contracts from Kansas City during the past few decades and in recent years. Industrial Wrecking will continue to bid for contracts in Kansas City.

52. Industrial Wrecking and its owner Cacioppo want to bid for contracts in Kansas City in a system that does not consider the race or sex of the bidder, or the race or sex of the subcontractors used by a contractor.

## II. Kansas City's MWBE Program

53. For three decades, Kansas City has openly and admittedly discriminated based on race and sex when deciding who can receive public-contracting dollars.

54. In 1996, Kansas City adopted its Minority- and Women-Owned Business Enterprise Program ("MWBE program").

55. The City Council of Kansas City enacted the most recent iteration of the MWBE program in 2016 and has subsequently amended parts of it.

56. In addition to the MWBE ordinance, Kansas City has a written manual governing the MWBE program.

57. Discrepancies exist between the MWBE ordinance and the written manual.

58. Among other things, the MWBE ordinance (A) sets contract goals, (B) defines which business are eligible for satisfying the contract goals, and (C) includes a sunset provision.

### A. MWBE Contract Goals

59. Under the MWBE ordinance, Kansas City has set "city-wide annual goals" for the participation of minority business enterprises ("MBEs") and women business

enterprises ("WBEs") in all contracts that Kansas City enters into each year. Code § 3-427.

60. For MBEs, Kansas City has a "goal" of spending 14.7 percent of its contract dollars on MBEs each year. Code § 3-427(a) (setting goal); Code § 3-421(a)(24) (defining "goal").

61. For WBEs, Kansas City has a "goal" of spending 14.4 percent of its contract dollars on WBEs each year. Code § 3-427(a) (setting goal); Code § 3-421(a)(24) (defining "goal").

62. Thus, for example, if Kansas City spends $1 billion in a given year, its "goal" is for MBEs to receive at least 14.7 percent of those dollars ($147,000,000) and for WBEs to receive at least 14.4 percent of those dollars ($144,000,000). *See* Code §§ 3-427(a), 3-421(a)(24).

63. Kansas City's "goals" aren't merely "aspirational"—they're discriminatory quotas based on unlawful practices.

64. Kansas City accomplishes its "goals" by setting "goals" for individual contracts. *See* Code §§ 3-431, 3-433, 3-435.

65. Each year, the CREO director sets goals for individual contracts that potential contractors must satisfy in order to contract with Kansas City.

66. To qualify for an individual contract that has goals, a bidder, proposer, contractor, or developer must "submit a notarized contractor utilization plan" that details the MBEs and WBEs "that will participate in the contract," the work that the

MBEs and WBEs will perform, and "the amounts each is to be paid for such work." Code § 3-433(a).

67. Prime contractors must either be a MBE or WBE themselves or subcontract with such in order to meet "goals" on individual contracts. *See* Code § 3-435 (detailing which contract amounts are "credited toward achieving the goals").

68. In effect, the MWBE ordinance often makes it mandatory that a prime contractor subcontract with MBEs or WBEs in order to qualify for a city contract.

69. If a bidder or proposer submits "a bid or proposal that is not in material compliance with the requirements of" the MWBE ordinance—e.g., fails to swear under oath that MBEs and WBEs will participate in the contract—the bid or proposal must be rejected unless the goals are waived. *See* Code §§ 3-433(a), 3-445(a).

70. The waiver process offers little hope for potential contractors. CREO's director may waive the individual-contract goals only if a bidder, proposer, contractor, or developer "*actively* and *aggressively* demonstrates" "[g]ood faith efforts" to meet the prescribed goals. Code §§ 3-437, 3-441(a) (emphasis added).

**B. Eligible Businesses**

71. Only MBEs and WBEs that CREO or a reciprocal agency certifies are eligible to fulfill the city-wide and individual-contract goals. Code § 3-421(a)(34), (47); Code § 3-461(b).

72. Section 3-461 delineates the procedure for becoming certified by CREO.

73. To become certified, an MBE must be "[a] for-profit small business concern that" meets the following six criteria:

a. "Is at least 51 percent owned, managed, and independently controlled by one or more minorities";

b. "Has a real and substantial presence in the Kansas City metropolitan area as defined by section 3-461(c)";

c. "Meets the business size standards imposed by 13 CFR 121.201 as subsequently amended and" Division 2;

d. "Performs a commercially useful function";

e. "Is certified by" CREO; and

f. "Whose owner's or, for businesses with multiple owners, each individual owner's personal net worth (as defined in this section) is equal to or less than the permissible personal net worth amount determined by the U.S. Department of Transportation to be applicable to its DBE [Disadvantaged Business Enterprise] program."

Code § 3-421(a)(34).

74. Under the MWBE ordinance, a "minority" is an "African American"; "Hispanic American and/or Latino American"; "Asian and/or Pacific Islander American"; "Native American"; and "[o]n a case-by-case basis, an individual found by the director to have been subjected to individualized prejudice or cultural bias within American society within the city's marketplace and has demonstrated economic disadvantage and social disadvantage." Code § 3-421(a)(33). The first four categories of minorities are further defined in Code § 3-421(a)(33).

75. Regarding the "case-by-case basis" individuals, the MWBE ordinance does not define what "individualized prejudice or cultural bias" the person must have experienced.

76. "Economic disadvantage" is "[a] diminished ability to compete in the free enterprise system due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are found to be socially disadvantaged." Code § 3-421(a)(22).

77. "Social disadvantage" is "[a] diminished ability to compete in the free enterprise system due to at least one objective, distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, sexual orientation, or disability." Code § 3-421(43).

78. Similar to an MBE, a WBE must, to become certified, be "a for-profit small business concern" that (1) "[i]s at least 51 percent owned, managed, and independently controlled by one or more women"; (2) "[h]as a real and substantial presence in the Kansas City metropolitan area"; (3) meets certain business size standards; (4) "[p]erforms a commercially useful function"; (5) is certified by CREO; and (6) has an owner, or multiple owners, whose "individual . . . personal net worth is equal to or less than the permissible personal net worth" for the U.S. Department of Transportation's DBE program. Code § 3-421(47).

79. Finally, to become certified, an MBE or WBE "must demonstrate by written documentation or affidavit that it has suffered from past race or gender discrimination in the city and in the applicable trade or industry." Code § 3-461(b).

80. This written documentation or affidavit, however, is not sufficient to justify a program that discriminates on the basis of race or gender. "[T]he institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, '*before* it embark[ed] on an affirmative-action program." *See, e.g.*, *Shaw v. Hunt*, 517 U.S. 899, 910 (1996) (emphasis in original) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986)). Thus, the documentation or affidavit submitted for certification cannot serve as a post-hac justification for the MWBE ordinance.

**C. Sunset Provision**

81. The MWBE ordinance "continue[s] as described by" the MWBE ordinance "with the city-wide goals adjusted bi-annually unless" CREO's "director has undertaken a comprehensive disparity study, and upon completion of the disparity study, presented the study results to the city council to consider whether to maintain, modify, or terminate the business enterprise program described" in the MWBE ordinance. Code § 3-427(b).

## III. Kansas City's "Evidence" Supporting its MWBE Program

82. Over the three decades of operating its race- and sex-based contracting program, Kansas City has retained multiple consulting firms to conduct disparity studies.

83. According to one consulting firm, "[a] [d]isparity [s]tudy is an objective research tool used to determine if disparities in an agency's procurement activities

exist within certain race, ethnic, and gender groups in various [i]ndustry [c]ategories." Griffin & Strong PowerPoint at 8.[7]

84. Further, a disparity study "determines whether those disparities are statistically significant and likely caused by the race and gender status of firm owners." *Id.*

85. In 2016, Colette Holt & Associates conducted a disparity study that formed the factual basis for the current iteration of the MWBE ordinance. That iteration of the ordinance has remained in place, with some tweaks, for the past decade.

86. The 2016 disparity study, however, did not support that Kansas City had a compelling interest in remediating past discrimination.

87. The study examined just five years of city-funded purchase order and contract data and was based in part on anecdotes.

88. It did not, for example, identify specific instances of intentional race- or sex-based discrimination in Kansas City public contracting. *See Louisiana v. Callais*, 146 S. Ct. 1131, 1153 (2026) ("The States and Federal Government have no compelling interest in generally remediating 'past discrimination in a particular industry or region' or 'the effects of societal discrimination.'" (citation omitted)).

89. Nor did it identify Kansas City officials, staff, or other employees who discriminated against MBEs or WBEs in awarding contracts.

---

[7] https://www.kcmo.gov/home/showpublisheddocument/16684/639144396654370000

90. Nor did it provide evidence of Kansas City's active participation in race- or sex-based discrimination in the award of city contracts.

91. Moreover, the 2016 disparity study failed to provide a strong basis in evidence that a race-based contracting program was necessary to remediate any specific instance of identified discrimination. *Id.* ("[A]fter identifying the specific instance of discrimination, 'the institution that makes the racial distinction must have . . . a 'strong basis in evidence' to conclude that [its] remedial action [is] necessary." (second and third alterations in original) (citation omitted)).

92. In short, the 2016 disparity study failed to demonstrate that Kansas City had a compelling interest to discriminate on the basis of race. *See SFFA*, 600 U.S. at 206–07.

93. Similarly, the 2016 disparity study lacks evidence demonstrating that Kansas City had a sufficient interest to discriminate on the basis of sex. *See United States v. Virginia*, 518 U.S. at 533.

94. Finally, the 2016 disparity study failed to demonstrate that its recommendations were narrowly tailored to serve any alleged compelling or heightened interest in discriminating on the basis of race and sex.

95. Kansas City nevertheless adopted the current iteration of the MWBE ordinance based on the 2016 disparity study.

96. The MWBE ordinance, Kansas City's manual, and its practices lack a compelling interest and are not narrowly tailored.

97. Recently, Kansas City retained another consulting firm, Griffin and Strong, to conduct a new disparity study.

98. Griffin and Strong presented its results and recommendation to the City Council in May 2026.

99. Griffin and Strong's study results and recommendation were clear: Kansas City does not have a factual basis to discriminate on the basis of race and sex when contracting; it therefore should utilize a race- and sex-neutral small business program to serve any interest the City has.

100. Specifically, the 2026 disparity study considered the period of May 1, 2015, to April 30, 2022, and focused on determining the total utilization of minorities, women, and non-MWBEs in five contracting areas: (1) construction; (2) architecture and engineering; (3) professional services; (4) other services; and (5) goods and supplies.

101. According to Griffin and Strong, the "[a]vailability of businesses for public contracting is crucial to understanding whether a disparity exists within the "[r]elevant [g]eographic [m]arket [a]rea." 2026 Disparity Study at 68.

102. "Availability is a benchmark to examine whether there are any disparities between the [u]tilization of the [s]tudy [g]roups and their [a]vailability in the marketplace." *Id.*

103. Therefore, the study determined minorities', women's, and non-MWBE's availability in the marketplace and then proceeded to compare their availability with their utilization. *Id.*

104. The study demonstrated that minorities were *overutilized* in many industries in relation to their availability in the marketplace.

105. For example, in the construction industry, women and minorities—African Americans, Hispanic Americans, and Native Americans—were overutilized in relation to their availability in the market place. Griffin & Strong PowerPoint at 17.

106. African Americans and Native Americans were also overutilized in the goods-and-services industry. *Id.*

107. Asian Americans, Hispanic Americans, and women were overutilized in the other-services industry. *Id.*

108. African Americans were overutilized in the architecture and engineering industry. *Id.*

109. In some instances, a disparity existed between a minority's utilization and availability, but it was not "statistically significant." *Id.*

110. In other instances, minorities and women had parity between their utilization and availability. *Id.*

111. In short, this data made clear that Kansas City's "current race- and gender-conscious program" cannot continue because there is not a factual basis supporting continued discrimination on the basis of race and sex. *See id.* at 12.

112. Moreover, the 2026 disparity study did not, for example, identify specific instances of intentional race- or sex-based discrimination in Kansas City public contracting. *See Louisiana*, 146 S. Ct. at 1153.

113. Nor did it identify Kansas City officials, staff, or other employees who discriminated against MBEs or WBEs in awarding contracts.

114. Nor did it provide evidence of Kansas City's active participation in race- or sex-based discrimination in the award of city contracts or the passive participation in a system of racial exclusion. *Croson*, 488 U.S. at 492.

115. Without evidence identifying specific instances of past discrimination, Kansas City cannot establish that it has a compelling or heightened interest in continuing its race- and sex-based contracting program. *Id.*; *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *United States v. Virginia*, 518 U.S. at 532.

116. Even if Kansas City could satisfy the compelling or heightened interest requirement, race- and gender-*neutral* measures could be used to achieve that interest—as the 2026 disparity study concluded. *See* 2026 Disparity Study at 32.

117. Specifically, Griffin and Strong recommended Kansas City utilize a race- and gender-neutral small-business enterprise program instead of a race- and gender-based program. *Id.*

118. One would expect that Kansas City would champion and celebrate these results as demonstrating that Kansas City has progressed. Instead, its City Council members resisted Griffin and Strong's findings and recommendation. *See* May 2026 Disparity Study Presentation.[8]

[8] https://www.kcmo.gov/city-hall/departments/disparity-study-2026-2379

119. And, upon information and belief, Kansas City has continued to operate its MWBE program despite the fact that the 2026 disparity study has been presented to the City Council and that the study demonstrates that the race- and sex-based program cannot continue. *But see* Code § 3-427(b).

**IV. The MWBE Program Harms Cacioppo and Industrial Wrecking**

120. Industrial Wrecking does not qualify as an MBE because it is not at least 51% owned by individuals who qualify as a minority under the City's MWBE program.

121. Industrial Wrecking does not qualify as a WBE because it is not at least 51% owned by a woman.

122. Industrial Wrecking and Cacioppo oppose governmental policies that treat contractors or subcontractors differently because of their race and sex—like Kansas City does. Industrial Wrecking and Cacioppo wish to bid for government contracts in Kansas City without consideration of their race or sex.

## CAUSES OF ACTION

### Claim 1
### Unlawful Race Discrimination
### U.S. Const. Amend. XIV, § 1
### Missouri

123. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

124. The Fourteenth Amendment of the U.S. Constitution makes it unlawful for a state actor to discriminate against an individual because of the individual's race. *See* U.S. Const. amend XIV, § 1.

125. Kansas City's MWBE ordinance, policy, and practice treat businesses differently based on the race of their owners; for example, they formally disadvantage white-owned businesses.

126. Because its ordinance and policy grant special preferences to businesses based on the race of the businesses' owners, the policy must satisfy strict scrutiny. *Louisiana*, 146 S. Ct. at 1152–53; *Croson*, 488 U.S. at 493.

127. Kansas City does not have a compelling governmental interest that justifies the MWBE program's racial classifications.

128. Kansas City has not and cannot identify specific instances of racial discrimination.

129. Kansas City has not and cannot adduce a strong basis in evidence that its racial classification was necessary to remedy specific governmental discrimination. *Louisiana*, 146 S. Ct. at 1152–53.

130. Even if Kansas City could demonstrate a compelling interest (it cannot), the MWBE ordinance is not narrowly tailored to meet any such compelling interest.

131. Kansas City refuses to consider businesses who are not owned by a "minority" for a certain percentage of the City's public-contract dollars because of their race.

132. Kansas City's discrimination against otherwise eligible businesses for its public-contract dollars adversely affects Missouri's quasi-sovereign interests in "the health and well-being—both physical and economic—of [Missourians] in general." *See Alfred L. Snapp & Son*, 458 U.S. at 607; *see also id.* at 609 (recognizing "the

political, social, and moral damage of discrimination" on a substantial segment of the State even though the tangible effects were limited).

133. Missouri therefore has *parens patriae* standing to seek relief to protect its quasi-sovereign interest. *See Lynch v. Nat'l Prescription Adm'rs*, 787 F.3d 868, 872 (8th Cir. 2015).

134. Kansas City is a state actor. Missouri, through the Attorney General, may sue to enforce federal law against a state actor. *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255–56 (2011).

135. Alternatively, or in addition, Missouri may sue to enjoin a party acting under color of state law. *See, e.g.*, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 50 U.S. (9 How.) 647, 657–58 (1850). As the Eighth Circuit has explained, "there is an equitable tradition of suits to enjoin unconstitutional actions by state actors." *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015)).

136. Because the State has significant sovereign interests in ensuring its power is not being used to discriminate and a quasi-sovereign interest in protecting the welfare of its citizens, the State is entitled to declaratory and injunctive relief against Kansas City.

**Claim 2**
**Unlawful Race Discrimination**
**U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983**
**Cacioppo and Industrial Wrecking**

137. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

138. Kansas City has acted, is acting, and will continue to act "under color of state law within the meaning of Section 1983.

139. Kansas City has disqualified businesses—including Industrial Wrecking—from a percentage of its public-contract dollars because of the businesses' owners' race.

140. For the reasons explained in Claim 1 above, Kansas City's MWBE ordinance, policy, and practice violates the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

141. Kansas City unlawfully considered the race of Cacioppo and Industrial Wrecking when they bid for contracts. Specifically, Kansas City unlawfully disadvantaged Industrial Wrecking because Cacioppo is white.

142. On information and belief, Cacioppo and Industrial Wrecking would have obtained additional contracts with Kansas City but for the fact that Kansas City considers the race of contractors.

143. On information and belief, Cacioppo and Industrial Wrecking would receive more government contracts in the future if Kansas City stopped considering the race of contractors.

144. In considering the race of Cacioppo and Industrial Wrecking when they bid for contracts, Kansas City has denied Cacioppo and Industrial Wrecking "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.

145. Kansas City will continue to harm Cacioppo and Industrial Wrecking unless this Court intervenes.

146. Cacioppo and Industrial Wrecking are therefore entitled to judgment against Kansas City in the form of a declaration and nominal damages.

**Claim 3**
**Unlawful Sex Discrimination**
**U.S. Const. Amend. XIV, § 1**
**Missouri**

147. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

148. Kansas City favors women over men when awarding government contracts.

149. Refusing to consider a business "simply because" of its owner's sex is sex discrimination and is no more permissible than race under the Equal Protection Clause. *See United States v. Virginia*, 518 U.S. at 532.

150. Kansas City does not have a "legitimate" interest that justifies its sex-based classification. *See id.* at 539–40.

151. And with respect to narrow tailoring, Kansas City's discriminatory MWBE ordinance, policy, and practice is not "substantially related" to the asserted interest of inclusivity.

152. Kansas City's discrimination against otherwise eligible businesses for its public-contract dollars adversely affects Missouri's quasi-sovereign interests in "the health and well-being—both physical and economic—of [Missourians] in general." *See Alfred L. Snapp & Son*, 458 U.S. at 607; *see also id.* at 609 (recognizing "the political, social, and moral damage of discrimination" on a substantial segment of the State even though the tangible effects were limited).

153. Missouri therefore has *parens patriae* standing to seek relief to protect its quasi-sovereign interest. *See Lynch*, 787 F.3d at 872.

154. Kansas City is a state actor. Missouri, through the Attorney General, may sue to enforce federal law against a state actor. *See Va. Off. for Prot. & Advoc.*, 563 U.S. at 255–56.

155. Alternatively, or in addition, Missouri may sue to enjoin a party acting under color of state law. *See, e.g., Pennsylvania*, 50 U.S. (9 How.) at 657–58. As the Eighth Circuit has explained, "there is an equitable tradition of suits to enjoin unconstitutional actions by state actors." *Missouri*, 114 F.4th at 986 (citing *Armstrong*, 575 U.S. at 326–27).

156. Because the State has significant sovereign interests in ensuring its power is not being used to discriminate and a quasi-sovereign interest in protecting the welfare of its citizens, the State is entitled to declaratory and injunctive relief against Kansas City.

**Claim 4**
**Unlawful Sex Discrimination**
**U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983**
**Cacioppo and Industrial Wrecking**

157. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

158. Kansas City has acted, is acting, and will continue to act "under color of" state law within the meaning of Section 1983.

159. For the reasons explained in Claim 3 above, Kansas City's MWBE ordinance, practice, and policy violate the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

160. Kansas City unlawfully considered the sex of Cacioppo and Industrial Wrecking when they bid for contracts.

161. On information and belief, Cacioppo and Industrial Wrecking would have obtained additional contracts with Kansas City but for the fact that Kansas City considers the sex of contractors and favors women.

162. On information and belief, Cacioppo and Industrial Wrecking would receive more government contracts in the future if Kansas City stopped considering the sex of contractors.

163. In considering the sex of Cacioppo and Industrial Wrecking, Kansas City violated Cacioppo's rights under the Fourteenth Amendment's Equal Protection Clause.

164. Hence, Kansas City has denied Cacioppo and Industrial Wrecking "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.

165. Kansas City will continue to harm Cacioppo and Industrial Wrecking unless this Court intervenes.

166. Cacioppo and Industrial Wrecking are therefore entitled to judgment against Kansas City in the form of a declaration and nominal damages.

**Claim 5**
**Discriminatory Contracting Impairment**
**42 U.S.C. §§ 1981, 1983**
**Cacioppo and Industrial Wrecking**

167. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

168. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[] . . . ." 42 U.S.C. § 1981(a).

169. For purposes of Section 1981, the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

170. Section 1981 protects rights "against . . . impairment under color of State law." 42 U.S.C. § 1981(c).

171. Defendants are state actors subject to the strictures of Section 1981. *See, e.g.*, *Stewart v. City of St. Louis*, No. 4:04CV885 RWS, 2006 WL 1663023, at *9 (E.D. Mo.

June 9, 2006); *Delgado-O'Neil v. City of Minneapolis*, 745 F. Supp. 2d 894, 901 (D. Minn. 2010).

172. Cacioppo is a member of a protected class because of his race and color.

173. Cacioppo and Industrial Wrecking were, are, or will be contractors or would be contractors with the City.

174. Kansas City has interfered, is interfering, and will interfere with Cacioppo's and Industrial Wrecking's "mak[ing] and enforc[ing]" contracts with the City. 42 U.S.C. § 1981(b).

175. Kansas City has interfered, is interfering, and will interfere with Cacioppo's and Industrial Wrecking's "mak[ing] and enforc[ing] contracts" because of its intent to discriminate against persons because of their race or color. *Id.* Specifically, Kansas City has unlawfully interfered with Cacioppo's making and enforcing contracts because he is white.

176. Kansas City has violated, is violating, and will continue to violate 42 U.S.C. § 1981.

177. Cacioppo and Industrial Wrecking are therefore entitled to declaratory and injunctive relief.

## PRAYER FOR RELIEF

The State of Missouri, appearing on the relation of its Attorney General, Cacioppo, and Industrial Wrecking pray this Court:

A. Declare, adjudge, and decree that Kansas City's MWBE ordinance, policy, and practice are unlawful under Amendment XIV, § 1 of the U.S. Constitution and the Civil Rights Act of 1866 (42 U.S.C. § 1981);

B. Issue declaratory relief stating that Kansas City's establishing race- and sex-based qualifications for its public-contract dollars is unconstitutional;

C. Preliminarily and permanently enjoin Defendants, including Kansas City and its directors, officers, and agents, from disqualifying businesses and their owners for public-contract dollars on the basis of race or sex and from engaging in unlawful discrimination on the bases of race and sex;

D. Award nominal damages to Missouri, Cacioppo, and Industrial Wrecking in the amount of $1.00;

E. Issue an award of attorneys' fees and costs in this action pursuant to Federal Rule of Civil Procedure 54(d) and 42 U.S.C. § 1988; and

F. Award all other relief this Court deems equitable and just.

Dated: July 22, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
Missouri Attorney General

<u>*/s/ Louis J. Capozzi III*</u>
Louis J. Capozzi III, #77756
*Solicitor General*
Kathleen Hunker, #78819*
*Principal Deputy Solicitor General*
Alexandria L. Overcash, #78289*
*Assistant Solicitor General*
Victoria S. Lowell, #76461
*Assistant Solicitor General*
Madeline S. Lansdell, #78358
*Assistant Solicitor General*

Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (314) 340-4754
Fax: (573) 751-0774
Louis.Capozzi@ago.mo.gov
Kathleen.Hunker@ago.mo.gov
Alexandria.Overcash@ago.mo.gov
Victoria.Lowell@ago.mo.gov
Madeline.Lansdell@ago.mo.gov

*Counsel for Plaintiffs*

**Pro hac vice motion forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of this Complaint shall be served in accordance with Federal Rule of Civil Procedure 4.

*/s/ Louis J. Capozzi III*